UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Donald Kakaygeesick,[1]

        Petitioner,

vs.

Ken Salazar,[2] Secretary,
United States Department of
Interior, and George Skibine,
Secretary of the Bureau of
Indian Affairs,

        Respondents.        Civ. No. 08-4252 (JMR/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a special assignment, made in accordance with the provisions of Title 28

---

[1]The Administrative Record contains variant spellings of the Petitioner's last name including, among others, "Ka-Kee-Ka-Kee-Sick," "KaKayGesick," and "Ka-Ka-Geesick." For convenience, we employ the spelling adopted by the Petitioner, which he describes as the most current. See, Petition, Docket No. 1, at pp. 2-3 ¶3.

[2]Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Secretary of the Interior Ken Salazar is substituted for his predecessor, Secretary Dirk Kempthorne.

U.S.C. §636(b)(1)(B), upon the Respondents' Motion for Summary Judgment. A

Hearing on the Motion was conducted on March 26, 2009, at which time, the

Respondents appeared by Lonnie F. Bryan, Assistant United States Attorney, and no

appearance was made by, or on behalf of, the Petitioner. For reasons which follow,

we recommend that the Respondents' Motion be granted.

## II. Factual and Procedural Background

The Petitioner seeks a judicial review, pursuant to Title 28 U.S.C. §1331, as

well as the Administrative Procedure Act, Title 5 U.S.C. §§702, et seq. ("APA"), of

several administrative decisions by the Secretary of the Interior, via the Bureau of

Indian Affairs ("BIA"). See, Petition, Docket No. 1, at p. 1.[3] Specifically, the

Petitioner requests that we review an Administrative Law Judge's ("ALJ's") Order,

dated July 12, 2005, Determining Heirs and Decree of Distribution in the Estate of

---

[3]Our jurisdiction to hear this matter is not in dispute. See, Runs After v. United States, 766 F.2d 347, 351 (8th Cir. 1985)("We agree with appellants that federal district courts do have subject matter jurisdiction under 28 U.S.C. §1331 to review, pursuant to the APA, the BIA action."), citing Goodface v. Grassrope, 708 F.2d 335, 338 (8th Cir. 1983); see also, Smith v. Babbitt, 96 F. Supp.2d 907, 910 (D. Minn. 2000); Crow Creek Sioux Tribe v. Bureau of Indian Affairs, 463 F. Supp.2d 964, 968 (D.S.D. 2006).

George Angus, see, <u>Administrative Record</u>, at pp. 29-31(hereinafter, <u>A.R.</u> at 29-31);[4]

and an ALJ's Recommended Decision, dated July 12, 2005, see, <u>A.R.</u> at 22-26,

together with the Interior Board of Indian Appeals' ("IBIA's") Order, dated

November 13, 2007, Adopting Recommended Decision as Modified.  See, <u>A.R.</u> at

620-31; see also, <u>Estate of Albert Angus, Sr., and Estate of George Angus</u>, 46 IBIA

90 (November 13, 2007)("<u>Estate of Albert Angus</u>").

In addition, the Petitioner "disagree[s] with the January 26, 1978, Order

Determining Heirs in the Estate of Mary Angus."  <u>Petition, Docket No. 1</u>, at pp. 3-4

¶4.[5]  The Respondents contend, however, that the Petitioner failed to exhaust his

---

[4]The Administrative Record contains duplications of numerous exhibits.  As a consequence, we cite to only one location, in the Record, where a particular exhibit can be found.

[5]While the Petitioner may well disagree with the Order Determining Heirs in the Estate of Mary Angus, which was issued on March 7, 1978, see, <u>A.R.</u> at 213-19, we are powerless to review the merits of that Order, as the statute of limitations, which is applicable to the APA, expired six (6) years after that decision and, obviously, well before the Petition in this case was filed in 2008.  See, e.g., <u>Izaak Walton League of America, Inc. v. Kimbell</u>, 558 F.3d 751, 758-59 (8th Cir. 2009)(holding that, because the APA does not include its own statute of limitations, the general statute of limitations, that is set forth in Title 28 U.S.C. §2401(a) applies, "which provides that 'every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.'" ).  Since any complaint, that the Petitioner might have had as to that Order, accrued on the date of its issuance, and since, according to the Record presented, no appeal was taken -- if,
(continued...)

administrative remedies, as to the ALJ's Order Determining Heirs and Decree of Distribution in the Estate of George Angus, and that, therefore, we are without jurisdiction to review that Order. Further, the Respondents argue that the IBIA's Order Adopting Recommended Decision, as Modified, was a lawful administrative adjudication. In order to provide those decisions a factual backdrop, we first detail the relevant facts, as they are contained in the certified Administrative Record. See, Docket No. 22.

The relevant events commence with the transfer of title, on August 30, 1905, to Allotment No. 3, from the United States Government, to the Petitioner's Great Grandfather, John Kakaygeesick, Sr., who was also known as Everlasting Sky. A.R. at 693. Allotment No. 3 was originally comprised of 102.20 acres of land, A.R. at 218, but, through inundation from the rising waters of the Lake of the Woods, as well as shoreline erosion, the "property now consists of less than twenty acres," A.R. at

_____

[5](...continued)
indeed, an appeal could have been taken in the absence of review by the IBIA -- the Petitioner is barred from now seeking a reversal, or modification, of that Order. See, Chandler v. U.S. Air Force, 255 F.3d 919, 921 (8th Cir. 2001)("A 'claim against [the] United States first accrues "on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action."'"), quoting Kinsey v. United States, 852 F.2d 556, 557 (Fed. Cir. 1988).

1084, and indeed, may be as few as five (5) acres.  <u>A.R.</u> at 732-33.  It is the title to Allotment No. 3 that is in dispute amongst the descendants of Everlasting Sky.

Everlasting Sky had two (2) children, John Kakaygeesick, Jr., and Mary Kakaygeesick Angus ("Mary").  <u>A.R.</u> at 207.  John Kakaygeesick, who predeceased Everlasting Sky, had a son, Robert Kakaygeesick, Sr. ("Robert"), who was the father of the Petitioner, <u>Id.</u>, while Mary had two (2) sons who were George Angus ("George"), and Albert Angus ("Albert").  <u>A.R.</u> at 228.  At the time of the Order that determined Mary's Heirs, Albert was dead, having passed away on April 4, 1976.  <u>Id.</u>; <u>A.R.</u> at 352.   The dispute over Allotment No. 3 effectively pits the Kakaygeesick branch of the family against the Angus branch.

On September 20, 1968, the title to Allotment No. 3 passed from Everlasting Sky, to Mary, as memorialized in a "Deed To Restricted Indian Land."  <u>A.R.</u> at 89-90. The branches of Everlasting Sky's descendants dispute the legitimacy of that exchange.  As the face of the Deed discloses, a name on the Deed, which denoted the designee to whom the property would transfer, was obliterated by typed "Xs," and the name of Mary was substituted, using a different type font than was employed in the rest of that document.  <u>Id.</u> at 89.  As further disclosed on the face of the Deed, the circumstances of the transfer were witnessed by George Kelly ("Kelly"), Margaret

Aas ("Aas"), and Ronald Beaulieu ("Beaulieu").  Id.  In addition, the Deed was notarized by "W. Leaf" -- Willard Francis Leaf ("Leaf"), A.R. at 66 -- who was then a Realty Officer for the BIA.  A.R. at 68.

As related during a deposition of Leaf, which was taken by counsel for each branch of the dispute, the Deed was dictated by Leaf, and typed by his secretary, in Bemidji, Minnesota, pursuant to a request that had been made to his office.  A.R. at 68-69.  The original request, that had been received by Leaf's office, contemplated that the Allotment would transfer to Robert.  A.R. at 70, and 78. Leaf then drove to Warroad, Minnesota, in order to meet with Everlasting Sky who, Leaf recalled, was then in a rest home.  A.R. at 69, and 483.  Due to Everlasting Sky's difficulty in understanding English, Leaf communicated to Everlasting Sky by means of an interpreter.  A.R. at 70.  According to Leaf, at that time, Everlasting Sky advised that he did not want to transfer the land to his grandson, Robert, but wanted to give the land to his daughter, Mary.  A.R. at 71.  Everlasting Sky was "definite" in wanting the land to go to Mary, and "he seemed very pleased with the transaction."  Id.

Leaf identified Kelly, and Beaulieu, as witnesses to the transaction, who also served as interpreters.  Id.  Leaf felt that, while Everlasting Sky had his "facilities," he executed the Deed using his thumb print.  A.R. at 72.  Aas was also identified, by

Leaf, as a witness to the Deed.  Id.  While he did not recall who had actually made the change on the Deed, Leaf acknowledged that the change was made at his direction, and that he had initialed the change.  A.R. at 73.  Leaf thought that the Deed had been recorded in the County Courthouse, and further, that the Deed had been forwarded to the BIA, which confirmed the transaction.  A.R. at 74, and 92.  Thereafter, on October 17, 1968, Leaf wrote a letter to Everlasting Sky advising that the transaction had been completed, and that "[t]he land is now held in trust for your daughter."  Id., and at 93.

In providing his testimony, Leaf relied heavily on a memorandum, which was dated September 20, 1968, A.R. at 91, and which was prepared contemporaneously with the transfer transaction, in order to memorialize the events surrounding the execution of the Deed.  A.R. at 78-79.  Since the events had occurred some thirty-five (35) years before his deposition, A.R. at 76, Leaf was glad that he had prepared the memorandum to refresh his recollection.  A.R. at 79.  Leaf was unable to explain, however, two dates on the Deed.  On the second page of the Deed, A.R. at 90, there is a notation suggesting that the Deed was in the BIA's office in Minneapolis on October 9, 1968, and yet there is a stamp, on the same page, showing that the Deed had been received in the BIA's office in Portland, Oregon, on October 11, 1968.  A.R. at 83.  Although Leaf was unable to confirm that the Deed could have been

transferred, from Minneapolis to Portland, in just two (2) days, he believed that the two (2) dates were accurate.  <u>A.R.</u> at 84-85.

During a Hearing on July 30, 2003, Beaulieu testified concerning the events surrounding the transfer of Allotment No. 3, in September of 1968, from Everlasting Sky to Mary.  <u>A.R.</u> at 783.  Beaulieu was questioned about the veracity of Leaf's memorandum of September 20, 1968, and he agreed with the memorandum's accuracy.  <u>A.R.</u> at 783-86.  Beyond that, Beaulieu related that Robert had informed Leaf's office that Everlasting Sky wanted to leave the property to him.  <u>A.R.</u> at 785. When they went to see Everlasting Sky, however, he informed them, in Ojibway, that he wanted Mary to get the land, and "[t]hat's why this Margaret Aas was there," <u>A.R.</u> at 786, to serve as an interpreter.  <u>Id.</u>  Beaulieu testified that he could understand the language, but that Everlasting Sky spoke a "different dialect," and spoke faster than Beaulieu.  <u>Id.</u>  While Beaulieu had difficulty in understanding Everlasting Sky, that was why they had Aas there to make sure, and Beaulieu believed that some of the interpretations were done correctly.  <u>A.R.</u> at 792.  Beaulieu was previously an acquaintance of Everlasting Sky, and he considered him to be "competent to make the decision that he wanted the property to go to his daughter, Mary Angus." <u>A.R.</u> at 789.

Beaulieu also confirmed that the other two (2) witnesses to the Deed's execution -- Aas and Kelly -- were dead.  Id.; see also, A.R. at 1046.

Nearly one year later, on July 27, 2004, Beaulieu testified, again, at a Supplemental Hearing.  At that time, Beaulieu identified the thumb print on the Deed as that of Everlasting Sky, and he also identified his own signature as a witness to the execution of the Deed.  A.R. at 738.  Beaulieu recounted that, a few days before that execution, Robert came to the BIA office and told Beaulieu "that the old man wanted to give him the land."  Id.  Again, Beaulieu confirmed that he was with Leaf when the Deed was presented to Everlasting Sky.  A.R. at 740.  He also confirmed that Aas served as the interpreter, since Everlasting Sky spoke Canadian Ojibway, and that language was spoken a lot faster.  A.R. at 741.  Although Beaulieu could understand him, he "couldn't understand him that good," and "that's why we had this woman come there."  Id.  According to Beaulieu, Aas asked Everlasting Sky to whom he wanted to give his land, and he said "'my daughter.'"  A.R. at 742.  Beaulieu again described Everlasting Sky as being competent.  A.R. at 743.  Thereafter, Beaulieu signed the Deed as a witness, and he observed Everlasting Sky place his thumb print on the Deed.  A.R. at 744.

Given the transfer that occurred in 1968, title to Allotment No. 3 descended from Mary through the Angus branch of the family, rather than from Robert through the Kakaygeesick branch. Mary died intestate on April 24, 1975. <u>A.R.</u> at 213, and 1028. As noted, Mary's son, Albert, predeceased her son, George, and therefore, title to Allotment No. 3 was divided, with a one-half (½) interest going to the Estate of Albert, and the other one-half (½) going to George. <u>A.R.</u> at 213. While, apparently, not universally known, see, <u>A.R.</u> at 832, George had prepared a Will, prior to the time of his death, which came before the ALJ during the probate of George's Estate. George had never been married, and had no children. <u>Id.</u>

George's Will was prepared on August 16, 1982, by Kathleen R. Miner ("Miner"), who was employed as a Realty Specialist at the BIA's Red Lake Agency. <u>A.R.</u> at 50. On that same date, the Will was witnessed by Frank A. Staples, and Maurice Bailey, whose signatures were notarized by Edna N. Johnson. <u>A.R.</u> at 48-50. In that Will, George devised and bequeathed his one-half (½) interest in Allotment No. 3 to Robert, who was George's first cousin, and to Robert Kakaygeesick, Jr. ("Robert Jr."), who was one of Robert's sons, and who was George's second cousin. <u>A.R.</u> at 47. George passed away on June 29, 1990. <u>A.R.</u> at 114-15. While copies of

that Will were available to the ALJ, during the Probate of George's Estate, the original Will was not located, despite a search of the BIA's records.

The Record discloses that, by a transmittal letter of June 19, 1985, "the original and two copies of the Last Will and Testament of George Angus," were sent by the Acting Superintendent of the BIA's Red Lake Agency, to one of the ALJs who was later to conduct Hearings in this matter. A.R. at 104. The transmittal letter reflects that the Will was sent by "CERTIFIED MAIL - RETURN RECEIPT REQUESTED." Id. The letter was received by the ALJ on June 21, 1985, and apparently, was delivered, on that same date, to the Field Solicitor's office for review. Id. The letter has a handwritten notation, by a Mark A. Anderson, for the Field Solicitor, that the Will was approved as to form on June 24, 1985. Id. In addition, the letter discloses that the letter was returned, thereafter, to the Red Lake Agency, which received the letter on June 26, 1985. Id.

The same sequence of events was corroborated, in a letter of September 15, 2003, by the ALJ to whom the Will was originally sent in June of 1985. A.R. at 165-66. As related by the ALJ at that time:

> Based upon the above provided chain of custody information, I recently asked the Red Lake Agency to conduct a due and diligent search of the Superintendent's

records for George's will or codicil or any replacement copy thereof that may have been retained at the request of the testator for safekeeping. I further requested that the results of that search be certified by the individual conducting the search.

A.R. at 166.

The Record further reflects that, on July 15, 2003, the ALJ telephoned Della Kingbird ("Kingbird"), of the Red Lake Agency, and asked that she search for George's original Will. A.R. at 244.

Consistent with the representation contained in the ALJ's letter of September 15, 2003, on September 9, 2003, the ALJ had transmitted a memorandum to Kingbird, which detailed the chain of custody relating to George's original Will, and asked that a "due and diligent search of the Superintendent's records be conducted" for George's Will, a codicil, or any replacement of the Will. A.R. at 474-75. During the course of the Hearing on July 27, 2004, Kingbird testified concerning George's Will. A.R. at 746-53. She confirmed that the only copies of the Will, which were in her files, as the Probate Specialist for the Red Lake Agency, were "carbon copies, which at that time it was standard procedure that you type up the original document and you have two carbon's [sic]." A.R. at 750. Kingbird testified that she did not believe that George asked for his Will back, although she noted that the Will had been sent to the Field

Solicitor's office.  <u>A.R.</u> at 749-50.  Kingbird did not believe that the original was in the Red Lake Agency, but thought that it could be filed with the Field Solicitor, although that office advised that it did not have the document.  <u>A.R.</u> at 750-51.  The Record discloses that, subsequently, on February 17, 2005, an Attorney-Adviser with the ALJ's office directed staff to contact Kingbird, as "one last attempt" to locate the "original copy" of George's Will.  <u>A.R.</u> at 166, and 242.  No such original was forthcoming.

During the period from September 18, 2002, through July 27, 2004, three (3) Evidentiary Hearings were conducted before ALJs, at which the foregoing evidence was received.  Thereafter, on July 12, 2005, the ALJ issued an Order Determining Heirs and Decree of Distribution in the Estate of George Angus, in which the ALJ found, with respect to the Will of George, as follows:

> There is a document on file which purports to be the decedent's Last Will and Testament.  However, after a due and diligent search by the Red Lake Agency, the original document could not [sic] found.  The document's due execution and continued existence could not be proved, therefore, the document will not be approved and the decedent's property shall pass under the statutes of descent.

<u>A.R.</u> at 30 ¶6.

Accordingly, in the absence of a Will, George's Estate passed to seven (7) members of the Angus side of the family, rather than to Robert, and to Robert Jr. <u>A.R.</u> at 30 ¶A. While the Petitioner seeks a review of that Order, the Government claims that the Petitioner has failed to exhaust his administrative remedies as to that claim, and therefore, that we do not have the requisite jurisdiction to review that Order.

Also on July 12, 2005, the ALJ issued a Recommended Decision and, after reviewing the foregoing evidence, found as follows:

> The evidence contained in this record indicates that on the day of the gift deed's execution Everlasting Sky understood and did, in fact, intend to gift deed Red Lake Allotment No. 3 to his daughter Mary Angus. The record further lacks any legitimate evidence suggesting in any manner or form that the deed was not a legitimate transfer of that property. I, therefore, recommend a finding that Red Lake Allotment No. 3 is correctly included in the decedents' property inventories.

<u>A.R.</u> at 24-25 [footnote omitted].

Thereafter, on September 9, 2005, the IBIA received the Petitioner's appeal to the ALJ's Recommended Decision. <u>A.R.</u> at 673. On November 13, 2007, the IBIA issued its Order Adopting Recommended Decision as Modified. <u>A.R.</u> at 620-31.

The Order extensively reviewed the evidence before the ALJ, <u>A.R.</u> at 620-25, and then recounted the ALJ's Recommended Decision, as finding the transfer to

Mary, from Everlasting Sky, to be legitimate. <u>A.R.</u> at 625-26. However, the IBIA declined "to reach the merits of th[at] appeal because of the lapse of time and failure by [Petitioner] and his father to pursue any claim to Allotment No. 3 with due diligence," and therefore, the IBIA adopted the conclusion of the ALJ's Recommended Decision, but did so on "alternative grounds." <u>A.R.</u> at 627-28. As explained by the IBIA:

> The Board has adhered to these legal precepts and requires appellants to be diligent in the pursuit of their claims. In the context of probates, appellants seeking to reopen estates that have been closed for more than three years must establish that they have been diligent during the intervening time period.

> \* \* \*

> [Petitioner] is faced with similar timeliness and diligence issues -- his father's as well as his own. First, [Petitioner's] father failed to exercise diligence. The gift deed process was initiated by [Petitioner's] father: Robert went to BIA and said that Everlasting Sky wanted to give him Allotment No. 3. Therefore, it is reasonable to expect that Robert would have inquired further into the status of the gift deed and the conveyance to him. Had he done so, he would have discovered that Everlasting Sky gave the land to Mary. Certainly, by the time Everlasting Sky died, which occurred shortly after he executed the gift deed, Robert should have inquired about the status of the gift deed or the status of the allotment and challenged BIA's decision to approve the

deed.  There is no indication in the record that Robert ever
objected to the gift deed to Mary or even inquired about it.
A.R. at 629-30 [footnotes omitted].

The IBIA went on to note that, even when Mary's Estate was probated in 1978, there

appeared to have been no inquiry by Robert, the Petitioner, or anyone else from the

Kakaygeesick family, concerning the inventory of Mary's Estate.  A.R. at 630.

The IBIA further explained that, because the Petitioner's interest in the property

was derivative of Robert's interest, Robert's lack of due diligence should be imputed

to the Petitioner.  Id.  However, the IBIA concluded that, even if such an imputation

were not present, the Petitioner, in his own right, had failed to demonstrate due

diligence in pursuing any claim to Allotment No. 3.  Id.  As the IBIA reasoned:

> When Robert died in 1998, [Petitioner] should have
> inquired at that time about the ownership of the land and
> should have raised any challenge within a reasonable time
> thereafter with BIA.
>
> Finally, we note that [Petitioner] states that he first saw the
> altered gift deed sometime in or about the year 2000.  Yet,
> inexplicably, no challenge was made to the gift deed until
> September 2002.  This delay is not reasonable.  The
> alteration is evident on the face of the deed.  To the extent
> [Petitioner] believed the alteration to be illegal or unauthor-
> ized by Everlasting Sky, he should have challenged the
> approval within a reasonable time of its discovery.
> Moreover, [Petitioner] provides no explanation for his own
> delay, let alone his father's delay.

> In sum, we conclude that [Petitioner's] challenge to the
> 1968 gift executed by Everlasting Sky is untimely. We
> adopt the recommended decision to the extent that it
> declines to remove Allotment No. 3 from the inventories of
> the estates of George and Albert [Angus].

A.R. at 630-31 [footnotes omitted].

In his current Petition, the Petitioner challenges the IBIA's decision, while the

Respondents urge us to affirm the IBIA's ruling. Since the Order of the ALJ involves

different factual and legal questions than the Order of the IBIA, we separately address

each of those determinations, as they have been challenged in the Petition before us.

## III. Discussion

A.  The ALJ's Order Determining Heirs and Decree of Distribution in the Estate of George Angus.

As we have detailed, if the ALJ had found that George's Will was legitimate,

then George's one-half interest in Allotment No. 3 would have devised to Robert, and

to Robert Jr. -- who were members of the Petitioner's branch of the family. The

Petitioner now claims a number of anomalies in the BIA's handling of the original of

that Will, and the Record is unsettled as to where the original of the Will came to rest,

or if it had been destroyed by the testator. We need not, however, and in fact, we may

not address those issues, as we find, consistent with the Respondent's argument, that

the Petitioner failed to exhaust his administrative remedies, as to those issues, and therefore, we are barred from resolving that aspect of the Petition.

In Darby v. Cisneros, 509 U.S. 137, 146 (1993), the Supreme Court definitively held as follows:

> Under §10(a) of the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, **is entitled to judicial review thereof.**" 5 U.S.C. §702 (emphasis added). Although §10(a) provides the general right to judicial review of agency actions under the APA, §10(c) establishes when such review is available. When an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule, the agency action is "final for the purposes of this section" and therefore "subject to judicial review" under the first sentence. While federal courts may be free to apply, where appropriate, other prudential doctrines of judicial administration to limit the scope and timing of judicial review, §10(c), by its very terms, has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute or rule clearly mandates.

The question devolves, therefore, to whether the Secretary of the Interior had prescribed an exhaustion requirement, in the Department's regulations, at the time of the issuance of the ALJ's Order of July 12, 2005.

As the Court observed, in Fort Berthold Land and Livestock Association v. Anderson, 361 F. Supp.2d 1045, 1050 (D.N.D. 2005):

Since 1975, regulations governing challenges to decisions of the Bureau of Indian Affairs have required an administrative appeal from most BIA decisions before judicial review of such decisions can be obtained. See, e.g., 25 C.F.R. §2.3(b)(1988); 40 Fed.Reg. 6478, 7666 (1989). In 1989, the regulations requiring an administrative appeal were reviewed without changing the appeal requirement. See 54 Fed.Reg. 6478 (1992).[6] These regulatory revisions also eliminated an intermediate appeal to the Commissioner of Indian Affairs and provided for direct review of BIA Area Director decisions by the Interior Board of Indian Appeals. See 54 Fed.Reg. 6478 (1989); compare 25 C.F.R. §2,3(a)(1988) with id. §2.4(e)(1992). At the same time, the rules governing appeals to the IBIA were amended to "ensure compatibility between those regulations and regulations of the Bureau of Indian Affairs." 54 Fed.Reg. 6483 (1989). In particular, an amendment reiterated the need for an appeal to the IBIA before the decision could be reviewed judicially. See id., at 6486; compare 43 C.F.R. §4.314(a)(1991) with id. (1988).[7]

---

[6]Section 2.6(a) reads as follows:

No decision, which at the time of its rendition is subject to appeal to a superior authority in the Department shall be considered final so as to constitute Departmental action subject to judicial review under 5 U.S.C. §704, unless when an appeal is filed, the official to who the appeal is made determines that public safety, protection of trust resources, or other public exigency requires that the decision be made effective immediately.

25 C.F.R. §2.6(a).

[7]Section 4.314(a) provides as follows:

(continued...)

"Thus, if an ALJ's decision is subject to appeal to the IBIA, administrative exhaustion is required and judicial review is barred in the absence of such an appeal." Smith v. Babbitt, 96 F. Supp.2d 907, 917 (D. Minn. 2000)[footnote omitted]; cf., Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians, 317 F.3d 840, 842 (8th Cir. 2003)("An unreviewed decision by an Area Director was not a final agency decision for purposes of exhaustion and judicial review."), citing 43 C.F.R. §§4.21(c), 4.314(a).

As reflected in the ALJ's Order Determining Heirs and Decree of Distribution in the Estate of George Angus, the "DECISION IS FINAL FOR THE DEPARTMENT UNLESS A PETITION FOR REHEARING IS TIMELY FILED IN ACCORDANCE WITH 43 C.F.R. §4.241[8] WITHIN 60 DAYS FROM THE DATE

---

[7](...continued)
> No decision of an administrative law judge, Indian probate judge, or BIA official that at the time of its rendition is subject to appeal to the Board, will be considered final so as to constitute agency action subject to judicial review under 5 U.S.C. §704, unless it has been made effective pending a decision on appeal by order of the Board.

43 C.F.R. §4.314(a).

[8]As of the time that the ALJ's Order issued, Section 4.241(a) provided as follows:

> Any person aggrieved by the decision of the administrative

(continued...)

HEREOF AS SET FORTH IN THE NOTICE ATTACHED HERETO, OR UNLESS

A PETITION FOR REOPENING IS FILED PURSUANT TO 43 C.F.R. §4.242," and

"NO CLAIMS SHALL BE PAID AND NO DISTRIBUTION SHALL BE MADE

DURING THE PENDENCY OF PROCEEDINGS FOLLOWING THE FILING OF

A PETITION OF [sic] REHEARING, EXCEPT AS SPECIFICALLY AUTHORIZED

---

[8](...continued)
>law judge or Indian probate judge may, within 60 days after the date on which notice of the decision is mailed to the interested parties, file with the administrative law judge or Indian probate judge a written petition for rehearing.

In turn, Section 4.242(a) provided:

>A person claiming an interest in an estate may file a petition in writing for reopening of the case if he or she:
>
>(1)    Had no actual notice of the original proceedings;
>
>(2)    Was not on the reservation or otherwise in the vicinity at any time while the public notices of the hearing were posted; and
>
>(3)    Files the petition within 3 years after the date of a final decision issued by an administrative law judge, Indian probate judge, or the Board, except as provided in §§4.203 and 4.206 and paragraph (i) of this section.

43 C.F.R. §§4.241(a), and 4.242(a)(March 9, 2005); see also, 70 Fed.Reg. 11804, 11820-21, and 2005 WL 539905 (F.R., March 9, 2005).

BY THE ADMINISTRATIVE LAW JUDGE." A.R. at 30 [emphasis in original].

Here, the Administrative Record contains no showing that the Petitioner filed either

a Petition for Rehearing, or for Reopening, as to the ALJ's Order. Instead, the Record

discloses, on two separate occasions, the IBIA's determination that no Petitions for

Rehearing were filed. See, Order Adopting Recommended Decision As Modified,

A.R. at 625 ("No petitions for rehearing were filed in response to the Orders

Determining Heirs."); see also, Order Dismissing Petition for Reconsideration, Estate

of Albert Angus, Sr., Estate of George Angus ("Reconsideration Decision"), 47 IBIA

57 at *57-58, 2008 WL 2573050 at *1 (2008), A.R. at 5 ("The Order Determining

Heirs was neither the subject of nor was it within the scope of [Petitioner's] appeal to

the [IBIA] from [ALJ] Clapp's Recommended Decision.").

Even if such Petitions had been filed, that act of filing would not have

exhausted the Petitioner's administrative remedies, as 43 C.F.R.§4.320(a) provided,

at the pertinent time, as follows:

> An interested party has a right to appeal to the [IBIA] from
> an order of an administrative law judge or Indian probate
> judge on a petition for rehearing or petition for reopening
> or regarding tribal purchases of interests in a deceased
> Indian's trust estate.

43 C.F.R. §4.320(a) (March 9, 2005); see also, 70 Fed.Reg. 11804, 11826, and 2005
WL 539905 (F.R., March 9, 2009).

No such appeal was taken by the Petitioner, and therefore, he has failed to exhaust the administrative remedies that were available to him, and we are without jurisdiction to address his arguments concerning the ALJ's Order Determining Heirs and Decree of Distribution of George Angus.

We are mindful of the Petitioner's contention, that "[t]he Main [sic] reason for [his Petition] is because Judges David A Clapp and Frederick W Lambrecht, Administrative Law Judges (ALJ) ruled that the August 16, 1982 <u>Last Will and Testament</u> and <u>Affidavit to Accompany Indian Will</u>, by George Angus was not a valid Will." <u>Petition, Docket No. 1</u>, at p. 4 ¶ 5 [emphasis in original]. However, his Appeal, as contained in this Record, only relates to the issues surrounding the transfer of Everlasting Sky's interest in Allotment No. 3 to Mary. <u>A.R.</u> at 677-93. There is no mention of George's Will, or any issue surrounding that Will. Although there is a passing reference to George handing Robert "the patent to Everlasting Sky's land," and saying, "[t]his is yours, you be sure you keep it good," <u>A.R.</u> at 687, there is nothing in the Petitioner's Appeal to the IBIA which would so much as intimate any challenge to the ALJ's determination that George's Will should be disallowed. <u>A.R.</u> at 677-93.

Undoubtedly, the Petitioner now wishes that he had taken an appeal from the Order Determining Heirs and Decree of Distribution in the Estate of George Angus, but the undeniable fact is that the Record before us is devoid of any such appeal, and the Petitioner provides no evidence that any such appeal was perfected. He urges that the reference, in the IBIA's Reconsideration Decision, see, A.R. at 5, to his having written letters referring to George's Will, reflects his appeal of the Order Determining Heirs and Decree of Distribution in the Estate of George Angus, but we have only found one such letter in the Record, and that was dated March 25, 2008. A.R. at 16. As related by the Petitioner in that letter, "[m]y appeal **will** state that George Angus left a will with out family names on it," and "[t]he document was shown to us in court." Id. [emphasis added]. Plainly, the Petitioner was expressing a future intent to file an appeal related to George's Will, but his letter of March 25 post-dated the IBIA's decision, which concerned the passage of title to Allotment No. 3 from Everlasting Sky to Mary, by four (4) months. No similar contention was made in the Petitioner's appeal to the IBIA, and that fact was underscored by the IBIA in denying the Petitioner's request for a reconsideration. See, Reconsideration Decision, supra, A.R. at 4-5 n. 2.

Since an appeal from that Order would only impact upon George's one-half (½) interest in Allotment No. 3, whereas the appeal from the ALJ's Recommended Decision could adversely affect the Angus descendants' entire interest in that Allotment, inclusive of that held by the Estate of Albert Angus, perhaps the Petitioner's attention was diverted, or inadvertence stepped in, but any such diversion of attention, or inadvertence, does not qualify as an exhaustion of administrative remedies. We understand the Petitioner to suggest that, because he was no longer represented by legal counsel -- since, with the Petitioner's consent, see, <u>A.R.</u> at 170-73, his counsel withdrew from his representation on May 28, 2003, <u>id.</u> -- his submissions to the IBIA should be read with great indulgence. See, <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)("As the Court unanimously held in Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), a pro se complaint, 'however inartfully pleaded,' must be held to less stringent standards than formal pleadings drafted by lawyers * * *."); see also, <u>Wishnatsky v. Rovner</u>, 433 F.3d 608, 610 (8th Cir. 2004).

While we have no quarrel with that proposition of law, nevertheless, an indulgent reading of <u>pro se</u> filings cannot add claims that were not originally pled. As the Court explained, in <u>Stone v. Harry</u>, 364 F.3d 912, 915 (8th Cir. 2004):

> When we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework. That is quite different, however, from requiring the district court to assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint.

Cf., Parisi v. The Boeing Co., 400 F.3d 583, 585 (8th Cir. 2005)("Although we have often stated that we will liberally construe an administrative charge for exhaustion of remedies purposes, we also recognize that 'there is a difference between liberally reading a claim which lacks specificity, and inventing, ex nihilo, a claim which simply was not made.'"), quoting Shannon v. Ford Motor Co., 72 F.3d 678, 684 (8th Cir. 1996)[internal quotation marks and citation omitted].

Indeed, in Stone v. Harry, supra at 914, the Court refused to consider a pro se claim on appeal, that was not presented to the District Court -- a holding that we cannot meaningfully distinguish from a refusal to consider, in the context of a judicial review, a claim that had not been fully exhausted in the underlying administrative proceeding.

Although not raised by either party, we are mindful that exhaustion requirements, whether arising under a statute or under agency regulations, can be jurisdictional, or non-jurisdictional. Under a jurisdictional statute or regulation, "exhaustion of administrative remedies cannot be excused or waived and the failure by a party to exhaust is a jurisdictional bar." Ace Property and Casualty Insurance Company v. Federal Crop Insurance Corporation, 440 F.3d 992, 996 (8th Cir. 2006).

"In contrast, a non jurisdictional statute [or regulation] codifies the common law exhaustion principle under which exhaustion of administrative remedies is favored, but may be excused by a limited number of exceptions to the general rule." Id., citing Weinberger v. Salfi, 422 U.S. 749, 765-66 (1975). "Exhaustion is presumed to be non jurisdictional 'unless Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision.'" Id. at 997, quoting Avocados Plus Inc. v. Veneman, 370 F.3d 1243, 1248 (D.C. Cir. 2004)[internal citations omitted].

Though not ruled upon by our own Court of Appeals, the Court of Appeals for the Ninth Circuit has held "that the exhaustion requirements of 43 C.F.R. §4.21(c) do not bar the filing of a colorable due process claim in federal court regarding Indian probate proceedings." Anderson v. Babbitt, 230 F.3d 1158, 1162 (9th Cir. 2000). The Court concluded that the language of Section 4.21(c) "is not 'sweeping and direct language that goes beyond a requirement that only exhausted claims be brought.'" Id., quoting Rumbles v. Hill, 182 F.3d 1064, 1067 (9th Cir. 1999), cert. denied, 528 U.S. 1074 (2000), quoting, in turn, Weinberger v. Salfi, supra at 757. Since, under closely analogous language, our Court of Appeals has held similar exhaustion requirements to be non jurisdictional, see, e.g., Ace Property and Casualty Insurance Company v.

Federal Crop Insurance Corporation, supra at 998-1000, and cited Anderson v. Babbitt, supra, favorably in doing so, we presume, without finding, that our Court of Appeals would find the exhaustion requirement of Section 4.21(c), to be non-jurisdictional. See, Ace Property and Casualty Insurance Company v. Federal Crop Insurance Corporation, supra at 999, and 1000 n. 4.

"A party may be excused from exhausting administrative remedies if the complaint involves a legitimate constitutional claim, if exhaustion would cause irreparable harm, if further administrative procedures would be futile, In Home Health[, Inc. v. Shalala,] 272 F.3d [554,] 560 [(8th Cir. 2001)], or if the issues to be decided are primarily legal rather than factual." Ace Property and Casualty Insurance Company v. Federal Crop Insurance Corporation, supra at 1000, citing Missouri v. Bowen, 813 F.2d 864, 871 (8th Cir. 1987). None of these exceptions properly apply here.

First, the Petitioner has plainly alleged in his Petition, both due process, and equal protection violations, nor can it be disputed that such allegations are exempt from any exhaustion requirement. See, Petition, Docket No. 1, at p. 3 ¶3 (due process), p. 5 ¶¶7 and 9 (due process), p. 9 ¶ 18 (due process), p. 19 (Fifth, Seventh, and Fourteen Amendments), and p. 20 (equal protection); see also, Califano v.

Sanders, 430 U.S. 99, 109 (1977)("Constitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions."); United States v. Lancman, 1998 WL 315346 at *7 (D. Minn., January 20, 1998)("As the Supreme Court has often noted in recent years, serious constitutional questions would arise if a statute were construed to foreclose constitutional review of agency actions.")[citations omitted].

However, "[t]he mere allegation of a due process violation 'is not sufficient to raise a "colorable" constitutional claim to provide subject matter jurisdiction,'" as "the plaintiff must allege 'facts sufficient to state a violation of substantive or procedural due process.'" Anderson v. Babbitt, supra at 1163, quoting Hoye v. Sullivan, 985 F.2d 990, 992 (9th Cir. 1992). Here, in most instances, the Petitioner employs his assertions of a constitutional deprivation as a shorthand restatement of his contention that the ALJ, and subsequently, the IBIA, came to the wrong decisions.[9] Otherwise, the alleged constitutional infractions are a product of the Petitioner's suspicions, and

---

[9]For example, the Petitioner claims that the ALJ failed in his duty of honoring the testator's intent, and of investigating all of the facts. See, Petition, Docket No. 1, at p. 5 ¶¶7, and 9. However, there is no evidence, other than the Petitioner's self-serving belief, that the Kakaygeesick branch of the family should be awarded all of Allotment No. 3, to support either accusation.

surmise, but no evidence of Record supports them.[10]  Accordingly, we conclude that

no legitimate, or even any colorable, constitutional claim has been presented for our

review.

Next, there can be no responsible argument that the exhaustion of remedies

would have caused the Petitioner any irreparable harm.  Rather, properly raised and

supported, an assertion of error to the IBIA, as to the propriety of the ALJ's implicit

rejection of George Angus's Will, because it was not an original, or a certified copy

of the original, would have allowed the agency, which promulgated the need for an

original Will, to explain any legitimate bases for its own regulatory rule making.  See,

---

[10]According to the Petitioner, the ALJ somehow denied Petitioner's counsel the opportunity to discover, and quizzically, compelled his attorneys to withdraw from their representation of him.  See, Petition, Docket No. 1, at pp. 9-10 ¶18.  Once again, no evidence supports either assertion and, in fact, the Petitioner's legal counsel did engage in discovery, including the deposition of Leaf.  Further, he asserts, without any evidentiary support, that "Red Lake Agency authorities have been plotting to get the Kakaygeesick property, allotment no. 3, under their control since the passing of the Indian Reorganization Act on June 18, 1934," id. at p. 14 ¶26; that "[n]o one not even George Angus challenged our right to possession of the land," id. at p. 15 ¶27; and that "[ALJ] Lambrecht who probated the Mary angus [sic] estate failed to notify my father, Robert Kakaygeesick, who's [sic] name is still visible beneath the x's on the Deed." Id. at 15 ¶29.  Lastly, there is nothing to support any contention that the Fifth, Seventh, or Fourteenth Amendments, have been violated, as these constitute mere conclusory assertions.  Id. at p. 19.  While the Petitioner voices an equal protection claim, we are unaware of any disparate treatment of the Kakaygeesicks which would demonstrate a denial of equal protection.

<u>43 C.F.R. §4.210</u>; <u>25 C.F.R. §§15.104(a)(8)</u>, and <u>15.202(f)</u>.[11] While we would not be

wholly unable to react to the allowance of such a regulatory requirement, as the

---

[11]In pertinent part, 43 C.F.R. §4.210 provides as follows:

> The probate of a trust estate before an OHA deciding official will commence when the probate specialist or BIA deciding official files with the OHA deciding official all information shown in the records relative to the family of the deceased and his or her property. The information must include the complete probate package described in 25 CFR 15.104 and 15.202 and any other relevant information. * * *.

In turn, 25 C.F.R. §15.104(a)(8) provides, in relevant part, as follows:

> (a)    You should provide us with the following documents and information before we can begin to process the probate package.
>
>         *    *    *
>
> (8)    All original or certified copies of wills and codicils, and any revocations. * * *

25 C.F.R. §15.202(f) provides as follows:

> The complete probate package must contain all of the following:
>
>         *    *    *
>
> (f)    All original or certified copies of wills, codicils and any revocations of wills or codicils.

- 31 -

Supreme Court explained, in <u>Federal Express Corp. v. Holowecki</u>, --- U.S. ---, 128 S.Ct. 1147, 1155 (2008):

> Just as we defer to an agency's reasonable interpretations of the statute when it issues regulations in the first instance, see Chevron [U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)], the agency is entitled to further deference when it adopts a reasonable interpretation of regulations it has put in force. See Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Under Auer, we accept the agency's position unless it is ""'plainly erroneous or inconsistent with the regulation.'"" Id., at 461, 117 S.Ct. 905 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)).

See also, <u>Solis v. Summit Contractors, Inc.</u>, 558 F.3d 815, 825 n. 5 (8th Cir. 2009); <u>Culpepper v. Schafer</u>, 548 F.3d 1119, 1122 (8th Cir. 2008); <u>Izaak Walton League of America, Inc. v. Kimbell</u>, 516 F. Supp.2d 982, 991 (D. Minn. 2007).

We find nothing about the ALJ's implicit interpretation of the referenced regulations to be either "plainly erroneous or inconsistent with the regulation," and therefore, on this Record, that interpretation is controlling. <u>Culpepper v. Schafer</u>, supra at 1122, quoting <u>Auer v. Robbins</u>, supra at 461.[12]

---

[12]As the Respondent urges, the absence of an original of George's Will, or a certified copy of the original, may intimate that George elected to revoke, or destroy the original, after it was executed and witnessed. See, <u>43 C.F.R. §4.260(c)</u>("The testator may, at any time during his or her lifetime, revoke or her his will by a subsequent will or other writing executed with the same formalities as are required in the case of the execution of a will, or by physically destroying the will with the

(continued...)

Nor can we legitimately find that further administrative procedures would have been futile, as there may well be adjudicated exceptions, by the IBIA, to the requirement that an original, or certified copy of a will, be included in the "probate package." Although our research on the subject has not been exhaustive, we have uncovered one decision by the IBIA, in which the original of a will was not found, and yet, under the unique circumstances there, a copy of the will was determined to be legitimate, because "there was insufficient evidence to show that [the testator] ever revoked that will." See, <u>Estate of Arnita Lois Parton Gonzales</u>, 35 IBIA 207, 212, 2000 WL 1512386 at *5 (IBIA, September 27, 2000). Accordingly, we can make no presumption, let alone a finding, that, had the Petitioner pursued the issue at the Administrative Hearing, and perfected an appeal of the ALJ's Order to the IBIA, the Petitioner's effort would have been futile.

---

[12](...continued)
intention of revoking it."). Notably, neither the Petitioner, nor anyone else at the Administrative Hearings, affirmatively sought to prove the legitimacy of the copy of George's Will which is in the Record. While the absence of the original Will from the files of the Red Lake Agency is problematic, as there was no record that George had requested that Will be returned to him, we cannot say, on this Record, that the ALJ's rejection of the copies in the Record was either clearly erroneous, or contrary to the applicable regulations.

Finally, we conclude that the legitimacy of George's Will, as it was contained in the Record, involved a mixed question of fact and law, and was not necessarily determinable as a matter of law, and therefore, that the failure of the Petitioner to exhaust his administrative remedies should not be excused. "Exhaustion is required because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." <u>McCarthy v. Madigan</u>, 503 U.S. 140, 145 (1992).[13] As the Court explained:

> As to the first of these purposes, the exhaustion doctrine recognizes the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not courts, ought to have primary responsibility for the programs that Congress has charged them to administer. Exhaustion concerns apply with particular force when the action under review involves the exercise of the agency's discretionary power or when the agency proceedings in question allow the agency to apply its special expertise. * * * The exhaustion doctrine also acknowledges the common-sense notion of dispute resolution that an agency ought to have an opportunity to

---

[13]"In actuality, the specific holding in <u>McCarthy v. Madigan</u>, 503 U.S. 140 (1992), is inapplicable to our determination, as that holding has been overruled by the amendments to the Prison Litigation Reform Act ("PLRA"), which were enacted in 1996, and which made exhaustion mandatory, rather than discretionary, as it had been when the Supreme Court decided that case." <u>Ross v. Felstead</u>, 2006 WL 2707344 at *6 n. 5 (D. Minn., September 19, 2006)[citations omitted]. Nevertheless, as an exposition of the salutary purposes of administrative exhaustion, <u>McCarthy</u> continues to have legitimacy and force.

correct its own mistakes with respect to the programs it administers before it is haled into federal court. Correlatively, exhaustion principles apply with special force when "frequent and deliberate flouting of administrative processes" could weaken an agency's effectiveness by encouraging disregard of its procedures. * * *

As to the second of the purposes, exhaustion promotes judicial efficiency in at least two ways. When an agency has the opportunity to correct its own errors, a judicial controversy may well be mooted, or at least piecemeal appeals may be avoided. * * * And even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context.

Id. at 145-46 [citations omitted].

Each of the beneficial purposes of administrative exhaustion is advanced by enforcing such a requirement here. Congress invested the BIA with the responsibility, in the first instance, to resolve matters involving the probate of Indian wills.[14] Allowing the

---

[14]"The Department [of the Interior] has consistently held that the execution and interpretation of a will disposing of trust or restricted property are questions of Federal, not state, law." In re Estate of Matilda Covington, 450 F.3d 917, 924 (9th Cir. 2006), quoting Estate of Florence Night Chase, 38 IBIA 188, 192 (November 5, 2002)[citations omitted]; see also, Estate of Elizabeth Frank Greene, 3 IBIA 110, 120 (September 19, 1974)("The Department has long adhered to the rule that state laws have no application in Indian trust probate proceedings involving wills."); Pahdopony v. United States Dep't of the Interior, 16 F.3d 417, 1994 WL 13890 at *1 (10th Cir., January 20, 1994), cert. denied, 513 U.S. 808 (1994)("The construction of Indian wills (continued...)

BIA to exercise that responsibility not only allows the special expertise of that agency to address frequently complex, and technical issues, that are firmly bound in Indian, and Federal administrative law, but also allows the Court to be more fully informed, on any subsequent administrative review, by the agency's compiling of a fully explored Administrative Record.  See, e.g., <u>Weinberger v. Salfi</u>, supra at 765 (exhaustion may allow agency "to compile a record which is adequate for judicial review.").  By failing to exhaust the remedies available to him, the Petitioner unnecessarily seeks to tax the efficiencies of this Court by immersing the process in fact-specific allegations which were not previously presented to the BIA for proper redress.

In sum, we conclude that the Petitioner's failure to exhaust the remedies that were available to him in the BIA, bars us from further considering his challenge to the ALJ's Order Determining Heirs and Decree of Distribution in the Estate of George Angus.

B.     <u>The ALJ's Recommended Decision, and the IBIA's Order Adopting Recommended Decision as Modified</u>.

---

[14](...continued)
is governed by federal law."), citing <u>Estate of Garcia</u>, 14 IBIA 106, 1986 WL 80101 at *1 (1986).  Plainly, the IBIA holds the requisite expertise to knowledgeably resolve questions involving the probate of Indian wills.

As we have noted, the ALJ determined that Everlasting Sky intended to transfer his title to Allotment No. 3 to his daughter, Mary. The Petitioner contests that finding, and also challenges the IBIA's subsequent determination that the failure of the Petitioner's father, as well as the failure of the Petitioner, to challenge the transfer of that title on a timely basis, warranted a denial of the Petitioner's appeal. There is no dispute, however, that the Petitioner properly exhausted his administrative remedies with respect to the resolution of the title transfer issue by the ALJ, and by the IBIA.

1.     Standard of Review. "It is a basic principle of administrative law that review of administrative decisions is 'ordinarily limited to consideration of the decision of the agency * * * and of the evidence on which it was based." Robinette v. Comm'r of the Internal Revenue Service, 439 F.3d 455, 459 (8th Cir. 2006), quoting United States v. Carlo Bianchi & Co., 373 U.S. 709, 714-15 (1963). "'A federal court is confined to the administrative record in deciding any appeal under the APA,' Maxey v. Kadrovach, 890 F.2d 73, 77 (8th Cir. 1989)[, cert. denied, 495 U.S. 933 (1990)]; see also Newton County Wildlife Assoc. v. Rogers, 141 F.3d 803, 807 (8th Cir. 1998), in order to 'preclude[] the reviewing court from conducting a de novo trial and substituting its opinion for that of the agency.'" South Dakota v. United States Dep't of the Interior, 423 F.3d 790, 802-03 (8th Cir. 2005), cert. denied, 549 U.S. 813

(2006), quoting <u>Voyageurs Nat'l Park Ass'n v. Norton</u>, 381 F.3d 759, 766 (8th Cir. 2004).

As a consequence, "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. §706, to the agency decision based on the record the agency presents to the reviewing court."  <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743-44 (1985)[citation omitted].  "However, certain exceptions have been carved from the general rule limiting APA review to the administrative record," but "[t]hese exceptions apply only under extraordinary circumstances, and are not to be casually invoked unless the party seeking to depart from the record can make a strong showing that the specific extra-record material falls within one of the limited exceptions."  <u>Voyageurs Nat'l Park Ass'n v. Norton</u>, supra at 766, citing <u>Animal Defense Council v. Hodel</u>, 840 F.2d 1432, 1436-38 (9th Cir. 1988), opinion amended, 867 F.2d 1244 (9th Cir. 1989).

"When there is 'a contemporaneous administrative record and no need for additional explanation of the agency decision, "there must be a strong showing of bad faith or improper behavior" before the reviewing court may permit discovery and evidentiary supplementation of the administrative record.'" <u>Id.</u>, citing <u>Newton County Wildlife Assoc. v. Rogers</u>, supra at 807-08, quoting, in turn, <u>Citizens to Preserve</u>

Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971), abrogated on other grounds by Califano v. Sanders, supra at 105; see also, South Dakota v. United States Dep't of the Interior, supra at 803. Here, the Petitioner has submitted for our review a number of documents, many of which are not a part of the Administrative Record. See, Docket Nos. 1-2, 1-3, 5-2, 5-3, 5-4, 5-5, 5-6, 30-2, 30-3, 30-4, 30-5, and 30-6.

The Petitioner has not made the "strong showing" "that the record is so incomplete as to preclude effective judicial review or that there is clear bad faith or improper behavior," as would satisfy the "extraordinary circumstances" standard for supplementing the Administrative Record. South Dakota v. United States Dep't of the Interior, supra at 803. While the Petitioner voices strong criticism of the ALJs, and of a variety of participants, and witnesses, who testified during the Administrative Hearing, his accusations are predicated on his suspicions and surmise, and not upon competent evidence, such as required to make the requisite "strong showing." As a consequence, to the extent that the referenced documents are extra-Record, we give them no weight, since they were not submitted to the BIA for its consideration, and our obligation is to review the Record developed by that agency. See, Camp v. Pitts, 411 U.S. 138, 142 (1973).

"Under the APA, the Court will set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *." Sierra Club v. Kimbell, 595 F. Supp.2d 1021, 1025 (D. Minn. 2009), quoting Title 5 U.S.C. §706(2)(A).  "An agency's decision or action is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Id., quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

"We are to make a searching inquiry into the facts, examining the full administrative record, 5 U.S.C. §706, but we do not substitute our judgment for that of the agency, South Dakota v. Ubbelohde, 330 F.3d 1014, 1031 (8th Cir. 2003)[, cert. denied, 541 U.S. 987 (2004)], even if the evidence would have also supported the opposite conclusion."  South Dakota v. United States Dep't of the Interior, supra at 799, citing Harrod v. Glickman, 206 F.3d 783, 789 (8th Cir. 2000).  "We ask whether the agency "'articulate[d] a rational connection between the facts found and the choice made.'"  Id., quoting South Dakota v. Ubbelohde, supra at 1031; see also, Cermak v.

Norton, 322 F. Supp.2d 1009, 1014 (D. Minn. 2004), aff'd, 478 F.3d 953 (8th Cir. 2007)("The court's sole duty is to determine whether there is a rational connection between the facts and the agency's action."), citing First Nat'l Bank v. Smith, 508 F.2d 1371, 1376 (8th Cir. 1974), cert. denied, 421 U.S. 930 (1975).

"Further, when a dispute is primarily factual and 'requires a high level of technical expertise,' resolution of the dispute 'is properly left to the informed discretion of the responsible federal agencies.'" Sierra Club v. Kimbell, supra at 1026, quoting Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976). "We will not try to identify failures in clarity or detail, [Motor Vehicle Mfrs. Ass'n of the United States, Inc. v.] State Farm [Mut. Auto. Ins. Co.,], 463 U.S. [29], 43 [(1983)] * * *, and will reverse 'only when there is no rational basis for the policy choice.'" South Dakota v. United States Dep't of the Interior, supra at 800, quoting South Dakota v. Ubbelohde, supra at 1032. "In other words, the agency need not exhaustively analyze every factor, but must base its determination 'upon factors listed in the appropriate regulations,' and must use a 'reasonable interpretation of the regulation and the statute' in reaching its conclusion." Id., quoting Harrod v. Glickman, supra at 788.

In the final analysis, "[i]f an agency's determination is supportable on any rational basis, we must uphold it." Voyageurs Nat'l Park Ass'n v. Norton, supra at

763, citing <u>Friends of Richards-Gebaur Airport v. FAA</u>, 251 F.3d 1178, 1184 (8th Cir.

2001), cert. denied, 535 U.S. 927 (2002).  "The burden is on the plaintiff to prove that

the agency's action was arbitrary and capricious."  <u>South Dakota v. United States</u>

<u>Dep't of the Interior</u>, supra at 800, citing <u>United States v. Massey</u>, 380 F.3d 437, 440

(8th Cir. 2004).

     2.   <u>Legal Analysis</u>.  As do some attorneys, the Petitioner has taken a

"shotgun" approach in this appeal, haphazardly firing objections in most any direction

in the earnest hope that one may hit a target.[15]  The Petitioner's shots largely are

---

[15]As the Supreme Court has wisely observed:

> Focusing on a small number of key points may be more
> persuasive than a shotgun approach.  As one expert advises:
> "The number of issues introduced should definitely be
> restricted.  Research suggests that there is an upper limit to
> the number of issues or arguments an attorney can present
> and still have persuasive effect."  R. Matlon,
> Opening/Closing Arguments 60 (1993)(citing Clader,
> Insko, & Yandell, The Relation of Cognitive and Memorial
> Process to Persuasion in a Simulated Jury Trial, 4 J.
> Applied Social Psychology 62 (1974)).  Another authority
> says:  "The advocate is not required to summarize or
> comment upon all the facts, opinions, inferences, and law
> involved in a case.  A decision not to address an issue, an
> opponent's theory, or a particular fact should be based on
> an analysis of the importance of that subject and the ability
> of the advocate and the opponent to explain persuasively

(continued...)

misdirected, and therefore, widely miss their mark, since his procedural and substantive objections are principally directed at the ALJ's Recommended Decision, and not at the IBIA's Order Adopting Recommended Decision, as Modified, which constitutes the final decision of the BIA that is before us for review.

As we have detailed, the ALJ's Recommended Decision found, by a preponderance of the evidence, <u>A.R.</u> at 23, citing <u>Estate of Aaron Francis Walter</u>, 16 IBIA 192, 198 (1988), that "Everlasting Sky understood and did, in fact, intend to gift deed Red Lake Allotment No. 3 to his daughter Mary Angus." <u>A.R.</u> at 24. As the ALJ also determined, "[t]he record further lacks any legitimate evidence suggesting in any manner or form that the deed was not a legitimate transfer of that property." <u>A.R.</u> at 24-25. Therefore, the ALJ "recommend[ed] a finding that Red Lake Allotment No. 3 is correctly included in [Albert's and George's] property inventories." <u>A.R.</u> at 25.

---

[15](...continued)
> the position to the fact finder." R. Haydock & J. Sonsteng,
> Advocacy: Opening and Closing §3.10, p. 70 (1994).

<u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003); see also, <u>Gagan v. American Cablevision, Inc.</u>, 77 F.3d 951, 955 (7th Cir. 1996)("Losers in a trial can go hunting for relief on appeal with a rifle or a shotgun," and "[t]he rifle is better," "[a]s * * * the shotgun approach may hit the target with something but it runs the risk of obscuring significant issues by dilution."), citing <u>United States v. Levy</u>, 741 F.2d 915, 924 (7th Cir. 1984), cert. denied, 469 U.S. 1021 (1984).

In its Order Adopting the ALJ's Recommended Decision, the IBIA reiterated the evidence which reflected a transfer of title to Allotment No. 3, from Everlasting Sky to Mary, but the IBIA expressly chose to base its adoption of the conclusion reached by the ALJ, not upon the factual details of that transfer, but upon an independent, "lapse of time" ground, holding that the Petitioner, and his father, failed "to pursue any claim to Allotment No. 3 with due diligence." <u>A.R.</u> at 627-28. Specifically, the IBIA recognized that rescission of a deed, based upon forgery, or upon an impermissible and material alteration, would survive to the heirs of the grantor, but subject to a caveat -- namely, "Claimants and their heirs may be estopped where they have slept on their rights and have failed to exercise diligence in investigating and pursuing their claims." <u>A.R.</u> at 628, citing 13 Am.Jur.2d <u>Cancellation of Instruments</u> §40 (2000).

Accordingly, to the extent that the Petitioner challenges the ALJ's Recommended Decision, because the ALJ was supposedly biased, because Leaf and Beaulieu were purportedly perjurers, or because of myriad other equally unsupported accusations, the challenges are immaterial to our review of the IBIA's Order Adopting Recommended Decision, as Modified, which was not predicated on the evidence that the Petitioner regards as perjured, or tainted by any purported bias on the part of the

ALJs.[16]  As a result, we do not further address, with the exception of those that are

---

[16]We cite these representative examples as illustrative of the Petitioner's approach. In the Petitioner's view, the ALJ was supposedly biased because he informed the Petitioner that he could not testify when questioning witnesses.  See, Memorandum in Opposition, Docket No. 30, at pp. 8-12. As framed, there is nothing wrong about that advisory, as the advice is frequently given to examiners who are not trained in the law.  Indeed, Federal Juries are routinely instructed:  "If a lawyer asks a witness a question which contains an assertion of fact, you [i.e., the Jury] may not consider the assertion as evidence of that fact," for "[t]he lawyer's statements are not evidence." Devitt, Blackmar and Wolff, Federal Jury Practice and Instructions §71.12 at p. 30 (1987).  At worst, the ALJ was cautioning the Petitioner that, simply because he included an assertion of fact in his question, did not establish that fact as evidence.

For the proposition that Leaf, and Beaulieu, were perjurers, the Petitioner appears to rely on his sense that their testimony could not be true because it favored the passing of the title to Allotment No. 3 to Mary, and the Petitioner believes, based on factual representations that are not in the Administrative Record, that no such transfer could have been intended.  See, Memorandum in Opposition, Docket No. 30, at pp. 20-26, and 28-30.  In fact, the Petitioner's criticism of Leaf is the least convincing, as he accuses Leaf of "gathering thumbprints from deceased or sleeping persons," based upon the extra-Record hearsay statements that he attributes, by way of his own personal notations, to his own attorney.  Id. at p. 5.

The Petitioner's other objections are equally without merit.  For example, the Petitioner contends that he was denied access to the Administrative Record by Tribal Realty Officer Harlan R. Beaulieu, who wrote, "[p]er your request for Tribal records * * * Red Lake Nation chooses to exercise it's [sic] sovereign Right and not share any records." Id. at p. 4.  While the quote does not come from any document in the Administrative Record, it appears that it emanates from a letter dated in 1996, well before any Hearings before the BIA in this case.  See, Docket No. 1-2, at p. 31.

As a final illustration, the Petitioner contends that the "indiscernibles" in the transcripts deprived him of due process, as did Leaf's failure to appear at an
(continued...)

relevant to our review, the litany of objections which the Petitioner has raised, as they are unsubstantiated and, in any event, they do not undercut the substantive holding of the IBIA's Order Adopting Recommended Decision, as Modified.

As we have noted, the IBIA denied the Petitioner's administrative appeal on the basis of the Department of the Interior's "well established requirement," A.R. at 629, Estate of Albert Angus, supra at 99, quoting Estate of George Dragswolf, Jr., 17 IBIA 10, 12 (1988), that those who would collaterally attack title to real estate must exercise due diligence in doing so. The IBIA further held that, in measuring a party's due diligence, any lack of diligence, by that party's predecessors, should be imputed to that party. Id. at 628, citing Estate of Lean Woman (Sankey), 35 IBIA 60, 62, 2000 WL 33968234 at *2 (2000). The IBIA explained the policy, which underlies the "due diligence" requirement, as follows:

> There is good reason for requiring diligence because there
> is a need for finality in matters pertaining to the ownership

---

[16](...continued)
Administrative Hearing, thereby denying the Petitioner an opportunity to question Leaf. As to the former, the transcripts do, in fact, contain omissions, owing to the failures of the transcriber, but we were able to comprehend the testimony given, even though, ultimately, that factual testimony is largely irrelevant to the IBIA's decision. As for Leaf, his testimony was preserved in a deposition, at which Leaf was questioned by the Petitioner's legal counsel. See, A.R. at 63. Accordingly, there was no denial of due process.

of land so that owners may rely on their title in making improvements and decisions relating thereto. Estate of Frank James, 1 IBIA 345, 351 (1972). Similarly, there is a need for finality in probate matters to facilitate the distribution of property and to enable heirs and devisees to exercise rights of ownership without fear of a challenge to their title. Cf. Estate of Newton McNeer, 33 IBIA 318, 320 (1999). The need for finality increases with the passage of time because evidence and witnesses are lost. Id. Even when witnesses are available and evidence is found, the memories of witnesses may be dim with respect to the details of any transaction and documents may be faded or torn and difficult to read. Thus the greater the passage of time since the gift deed, the greater will be the burden on those who challenge the gift deed.

The Board has adhered to these legal precepts and requires appellants to be diligent in the pursuit of their claims. In the context of probates, appellants seeking to reopen estates that have been closed for more than three years must establish that they have been diligent during the intervening time period. * * * Diligence also is required for challenging BIA's approval of deeds.

Id. at 98-99, citing <u>Baker v. Anadarko Area Director</u>, 17 IBIA 218, 221, 1989 WL 265080 at *3 (1989).

The Petitioner has not challenged the legitimacy of the "due diligence" requirement, and we find no grounds upon which to do so here. See, e.g., <u>Arrow Weinberger v. Rocky Mountain Regional Direction, BIA</u>, 46 IBIA 167, 171, 2008 WL 402135 at *3 (2008)("The Board has repeatedly held that appellants must be diligent in the pursuit of their rights[,] Estate of Albert Angus, Sr., 46 IBIA 90, 98 (2008)," and "[w]here

appellants have slept on their rights, they may find that a right they may once have had

to challenge or correct Departmental actions concerning land titles has expired or been

forfeited."); Estate of Francis Rock, 38 IBIA 297, 298, 2003 WL 23170142 at *2

(2003)(same); Estate of Herbert Bartlett Levering, 36 IBIA 192, 192, 2001 WL

34373230 at *1 (2001)(same).[17]

Rather, the Petitioner denies that either he, or his father, demonstrated any lack

of due diligence in pursuing a reversal of the transfer of title to Allotment No. 3, from

---

[17]"43 C.F.R. §4.242(h) authorizes reopenings of estates that have been closed for more than three years," and "[i]t provides that reopening 'shall be allowed only upon a showing that a manifest injustice will occur; that a reasonable possibility exists for correction of the error; that the petitioner had no actual notice of the original procedings; and that petitioner was not on the reservation or otherwise in the vicinity at any time while the public notices were posted.'" Estate of Herbert Bartlett Levering, 36 IBIA 192, 192, 2001 WL 34373230 at * 1 (2001). "In addition, under long-standing Departmental practice, petitioners must also show that they exercised due diligence in seeking reopening." Id.; see also, Estate of Francis Rock, 38 IBIA 297, 298, 2003 WL 23170142 at *1-2 (2003)(same).

After the completion of the administrative proceedings in Estate of Herbert Bartlett Levering, supra, a judicial review of the final administrative decision was taken. See, Cline v. Norton, 2003 WL 22052230 at *1 (D. Neb., September 2, 2003). In that review, the Court also recognized that, in addition to the exceptions listed in Section 4.242(h), "Petitioners must also show that they exercised due diligence in seeking the reopening." Id., citing Estate of Woody Albert, 14 IBIA 223 (1986). As was the case in Cline, the Record here does not satisfy the exceptions recited in Section 4.242(h) and, in our view, supports the ALJ's finding that title had properly passed, based upon direct, eyewitness testimony, to Mary. As a consequence, we limit our analysis to the application of the Department's "due diligence" standard.

Everlasting Sky to Mary.  According to the Petitioner, he first saw the gift deed, from

Everlasting Sky to Mary, "on or about November 28, 2000," as a result of a Freedom

of Information Act request to the BIA that his attorney submitted in the preceding

September.  <u>Memorandum in Opposition, Docket No. 30</u>, at p. 8.  He argues, however,

that his attorneys, "evidently decided the time to present this issue [i.e., of the gift

deed] would be at the Probate hearing."  <u>Id.</u>  He urges that "[i]t is unreasonable and

a manifest injustice that my challenge to the 'Gift Deed' should have been adjudicated

as 'untimely' because of an erroneous conclusion drawn by an administrative law

judge, because of the slowness of the administrative process or the inaction of our

attorneys."  <u>Id.</u>

The Petitioner's focus on 2000, however, fails to account for a significant

period of history that was addressed by the IBIA.  On this Record, the actual deed,

from Everlasting Sky to Mary, was executed in 1968 -- some thirty-four (34) years

before the Petitioner's challenge to the transfer of Allotment No. 3 that the Petitioner

here seeks to annul.  We find it overwhelmingly incredulous that Robert, who was the

intended beneficiary of that deed, prior to Everlasting Sky's reformation of his intent

so as to transfer the title to Mary, would not have inquired of Everlasting Sky, or of

someone else, inclusive of Mary, as to who was claiming ownership of the property.

As the IBIA correctly noted, Beaulieu testified that "Robert came to 'the office,' and told Beaulieu and others that Everlasting Sky was 'getting ready to die' and wanted Robert to have his land." Estate of Albert Angus, supra at 94-95, A.R. at 625; see also, A.R. at 738, 785, and 793 (transcript pages of Beaulieu's relevant testimony, at both the Hearing on July 27, 2004, and July 30, 2003). Notwithstanding that initiative, personally by Robert, to have the title to Allotment No. 3 transferred to him, the Petitioner would have us believe that Robert showed no interest in the title to that property when the deed, that Robert proposed, was not forthcoming. The indelible fact is, however, that there is no evidence in this Record that either Robert, or anyone on his behalf, pursued the issue of who held title to that Allotment at the time that it was transferred to Mary.

In 1978, Mary's Estate was probated, and formal recognition of her ownership of Allotment No. 3 was recorded in the BIA's Order. Yet, apparently, no one from the Kakaygeesick branch of the family inquired as to the contents of Mary's property inventory -- an inventory which listed the title to Allotment No. 3. Such an inquiry would have disclosed the basis for Mary's ownership of the property, and the information necessary to challenge such ownership before the BIA. Those events, of course, occurred some twenty-four (24) years before the challenge that the Petitioner

pursued during the Probate of Albert's, and George's Estates. Again, no interest, by the Petitioner, by Robert, or by any other member of the Kakaygeesick side of the family, is memorialized in the Administrative Record before us.

Now, for the first time in his Memorandum in Opposition, the Petitioner claims that, given his father's questions about the ownership of Allotment No. 3, the Petitioner made certain telephonic inquiries of BIA officials in the 1980's. See, Docket No. 30, at p. 31 ¶98. As recounted by the Petitioner, without any verifying documentation, "[i]n the early eighties, about the time this record shows the Mary Angus Probate decision became available at the Red Lake offices My [sic] father asked me to make a series of telephone calls to the Fort Snelling Minnesota BIA offices." Id. The Petitioner argues that he got the proverbial "run-around," with the "Red Lake Band" advising that "the land was entrusted to the Red Lake Band," and that "[t]hey refused to release any documents or information." Id. As a result, the Petitioner maintains that "[w]e did not see a Deed to Restricted Indian Lands[;] we did not know that there was such a thing." Id.

Unfortunately, neither the Petitioner, nor anyone else, introduced competent evidence that someone -- the Petitioner identifies no names -- prevented any search of the contents of Mary's Estate during the ensuing twenty (20) years. If such

evidence had been presented during the Administrative Hearing, or during the Administrative Appeal, the Petitioner would still have to explain why the Kakaygeesicks failed to pursue, from all available sources, including Freedom of Information Act requests, the disposition of the title to Allotment No. 3. It truly strains credulity to believe that, notwithstanding the overarching interest that the Kakaygeesicks have asserted in owning that specific piece of property, they would have let the matter rest in dormancy for decades. Again, the Petitioner's contention, that the ownership of that Allotment was a mystery, for over four (4) decades, is extremely difficult to fathom, given the averments of Lois Angus that, "[o]n various occasions, the Angus family has repeatedly told the KaKayGeesick family that they were the owners of the property and that the KaKayGeesicks had no right to deal with it." Estate of Albert Angus, supra at 95, A.R. at 625.

We understand the Petitioner to dispute the accuracy of Beaulieu's testimony, as well as the averments of Lois Angus, but our function on a review under the APA is not to reweigh the evidence, or assess credibility, but rather, to determine whether the decision of the IBIA is arbitrary and capricious, or is contrary to law.[18] See, e.g.,

---

[18]As to the testimony of Beaulieu, the Petitioner contends that Beaulieu's testimony, during the course of two (2) different Hearings, was conflicting as to how
(continued...)

Central South Dakota Cooperative Grazing District v. Secretary of the United States Department of Agriculture, 266 F.3d 889, 894 (8th Cir. 2001)("Under the APA scheme, we must uphold agency action unless it was '"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."'"), quoting Friends of Richards-Gebaur Airport v. FAA, supra at 1185, quoting, in turn, Title 5 U.S.C. §706(2)(A). "The scope of our review is narrow and we are not to substitute our judgment for that of the agency." Id. at 895, citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., supra at 43.

---

[18](...continued)
the name of Robert first appeared on the original deed to Allotment No. 3. See, Memorandum in Opposition, Docket No. 30, at pp. 21-22. We have reviewed the referenced testimony, and find no conflict -- on each occasion that Beaulieu testified, he clearly related that Robert had informed the staff in Beaulieu's office, that Everlasting Sky wanted to deed his property to Robert. While it is true, as the Petitioner asserts, that Beaulieu did not personally make the changes in the Deed, or know who substituted Mary's name for Robert's, he heard Everlasting Sky direct that the property should go to Mary, and witnessed Everlasting Sky place his thumb print on the Deed.

With respect to Lois Angus, the Plaintiff simply states that the IBIA "failed to consider the fact that Lois Angus was not truthful in the probate hearing," and "[t]his is a fact that a closer examination of the record would have revealed." Id. at p. 39. Apart from the Petitioner's conclusory accusation, however, there is nothing in the Record which establishes the falsity of any of Lois Angus' averments.

The Petitioner apparently believes that, under the APA, he gets a full, de novo Trial of the issues, with new witnesses, and additional evidence, but such de novo review is unavailable under the circumstances here.  See, Sierra Club Northstar Chapter v. Bosworth, 428 F. Supp.2d 942, 950 (D. Minn. 2006)("Limited exceptions have been recognized to allow supplementation [of the administrative record]" but, "[i]f there is a contemporaneous administrative record and no need for additional explanation of the agency's decision, only a 'strong showing of bad faith or improper behavior' will permit a court to allow supplementation."), citing, and quoting, Voyageurs Nat'l Park Ass'n v. Norton, supra at 766.

We find that the Record is not incomplete, and that the rationale for the IBIA's decision is adequately explained in its decision, and is amply supported by the current Administrative Record.  While the Petitioner voices all manner of "bad faith or improper behavior" on the part of the BIA, by individual ALJs and, apparently, by the IBIA, his accusations are simply expressions of his suspicions, and are not supported by a "strong showing," let alone any competent evidence.  See, Voyageurs Nat'l Park Ass'n v. Norton, supra at 766.  Consequently, there are no "extraordinary circumstances" present here, and we reject the Petitioner's effort to supplement the Record, or to engage in discovery, on this, or any other issue.  Id. at 766 ("These

exceptions apply only under extraordinary circumstances, and are not to be casually invoked unless the party seeking to depart from the record can make a strong showing that the specific extra-record material falls within one of the limited exceptions."), citing <u>Animal Defense Council v. Hodel</u>, supra at 1436-38; see also, <u>South Dakota v. United States Dep't of the Interior</u>, supra at 802-03; <u>Mahnomen County v. BIA</u>, 604 F. Supp.2d 1252, 1257-58 (D. Minn. 2009).

In addition, the IBIA underscored the Petitioner's own testimony that he first saw the deed, which ran from Everlasting Sky to Mary, in 2000, but did not challenge that deed until September of 2002, which the IBIA found to be a delay that "is not reasonable." <u>Estate of Albert Angus</u>, supra at 100, <u>A.R.</u> at 630. The Petitioner concedes the point, but accuses his attorneys of the delay in commencing a challenge, for which it would be "unreasonable and a manifest injustice" to hold him responsible. <u>Memorandum in Opposition, Docket No. 30</u>, at p. 8. However, the fact that the Petitioner elected to follow his counsel's advices does not exonerate him from any attendant delay attributable to that election. If such an attribution of fault were effective in satisfying the "due diligence" standard, then a party's attorney would be a likely target to excuse any form of lack of diligence. We do not find the Petitioner's argument persuasive and, in any event, the significance of the 2000 date is vastly

overshadowed by the long, and consistent history of Robert's, and the Petitioner's, lack of diligence in pursuing a challenge to Mary's ownership of Allotment No. 3.

Lastly, we recognize that the IBIA's decision was predicated on a somewhat different rationale than the ALJ's Recommended Decision, and it could be argued -- although the Petitioner does not make the argument -- that he was blind-sided by a rule of law, indigenous to the Department of the Interior, which he could not have anticipated so as to present evidence that would exonerate the extensive delays recognized by the IBIA. However, the rule on which the IBIA rested its decision was not new or novel, as both land transactions, and the distribution of estate assets, require finality and predictability in order that transfers of property can be economically sustainable.[19]

---

[19]A decision based upon the statutory law of Minnesota, while not controlling, illustrates the criticality of stability in the transfers of real property. In In re Estate of Nordlund, 602 N.W.2d 910, 913 (Minn.App. 1999), rev. denied (Minn., February 15, 2000)[emphasis supplied], the Court explained:

> We recognize that one of the underlying purposes of Minnesota's probate laws is to discover and make effective the decedent's intent. Minn.Stat. §524.1-102(2)(1998). But there are competing purposes, including the need for finality and predictability, particularly with regard to the transfer of real estate. As the supreme court has stated:

(continued...)

Were the Petitioner's position well-taken, then any innocent buyers of the

---

[19](...continued)

> Final decrees of the probate court are of great importance, embracing as they so often do the devolution of title to real estate. It is to be presumed that they express the deliberate judgment of that court upon the construction of wills where such direct the disposition of property. Such decrees should not be disturbed upon the mere say-so of the probate judge, years after made, that the intended construction of the will was not expressed. In re Turner's Estate, 181 Minn. 528, 532, 233 N.W. 305, 306 (1930).
>
> Moreover, even if the statute is deemed to be ambiguous, our analysis of legislative intent leads us to the same conclusion. The mischief to be remedied by the statute is the situation where property is entirely forgotten or is not discovered until after the decree of distribution is made. Separate provisions exist for situations where a property interest was distributed to the wrong party. See Minn.Stat. §524.3-909 (1998); Minn.Stat. §524.3-1006 (1998). Under these statutes **the right of any devisee to recover improperly distributed property from a distributee is barred at the later of either three years after the decedent's death or one year after the distribution of the property.** Minn.Stat. §524.3-1006.

While the Department of the Interior's regulations are analogous to Minnesota's statute, even if they were not, the agency would be plainly within its authority, as delegated by Congress, to adopt the same type of "due diligence" standard to properly effect finality and predictability in property transfers whether by deed, or by probate. Indeed, the Minnesota Supreme Court decided In re Turner's Estate, 181 Minn. 528, 532, 233 N.W. 305, 306 (1930), upon which the Court relied in Nordlund, not upon an enacted statute, but upon general policy considerations, such as the Department of the Interior, through the IBIA, has done.

property, in good faith, could potentially lose their ownership rights, which had long vested, owing to nothing more than the protracted delay of Robert, and later of the Petitioner, in enforcing what they perceived to be their ownership interests in the same property. The underlying rationale for the "due diligence" standard is salutary in assuring that undue or, as here, intractable delay, does not inure to the benefit of those who needlessly rested on their ownership beliefs. The rationale is particularly beneficial given the highly tenuous claims of ownership which have been advanced by the Petitioner in this instance, and which trace back some four (4) decades.

Had the Petitioner been interested in addressing the bases for the IBIA's decision, he could have timely exercised his right to seek a reconsideration on the specific grounds that he offers here, as well as on the basis that the IBIA's ruling was predicated upon a rule of agency law that was not expressly addressed in the preceding Administrative Hearings. However, the Petitioner failed to timely seek administrative relief.[20] As explained by the IBIA's Reconsideration Decision, supra:

---

[20]Notwithstanding the fact that the IBIA's Decision was transmitted to the Petitioner by certified mail, return receipt requested, the Petitioner did not file a timely Motion for Reconsideration. Rather, well after the time to seek a reconsideration had expired, the Petitioner wrote to the IBIA to advise that he had not received the IBIA's Decision on a timely basis. When he requested proof of delivery, the IBIA provided "a copy of the certified mail receipt card, which showed that the [IBIA's] November
(continued...)

> [Petitioner] now seeks an extension of time to 'appeal' the [IBIA's] November 13 decision, which we reject as untimely. Even assuming the [IBIA] may grant such requests, [Petitioner] has shown no good cause for us to do so. Therefore, even generously construing [Petitioner's] two letters as actual petitions for reconsideration, we are still compelled to dismiss because [Petitioner's] petitions are untimely and because [Petitioner] does not identify any substantive objections to the [IBIA's] November 13 decision.

Reconsideration Decision, supra at 57-58, 2008 WL 2573050 at * 1 (2008), A.R. at 5.

Notably, the Petitioner does not list the denial of his request for an extension of time, in which to file a Motion for Reconsideration, as an objection in his Petition before this Court.

In sum, notwithstanding our painstaking review of the Petition in this matter, and the underlying Administrative Record, we have found no instance where the IBIA

---

[20](...continued)
13 decision was delivered to [Petitioner's] address on November 19," and that "[t]he receipt card was signed by 'Jennifer Stish.'" Reconsideration Decision, supra, 47 IBIA, at 58, 2008 WL 2573050, supra at *1. In a subsequent letter to the IBIA, the Petitioner denied knowing Ms. Stish, and represented that, if he had timely received the Decision, then he would have "appealed," but he stated no substantive grounds on which he would have sought a reconsideration. Id. Applying IBIA precedent, the IBIA denied the request to grant an extension of the time in which to seek a reconsideration, "because [Petitioner] has not shown that his alleged lack of notice was due to any fault of the [IBIA]," id., citing Estate of Gloria Little Light Castro, 47 IBIA 14, 16 (2008), nor did "he even briefly identify any grounds for reconsideration of the [IBIA's] decision." Id.

"relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Central South Dakota Cooperative Grazing District v. Secretary of the Dep't of Agriculture, supra at 894, quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., supra at 43. Further, the IBIA "followed the necessary procedural requirements," South Dakota v. United States Dep't of Interior, 487 F.3d 548, 551 (8th Cir. 2007), quoting South Dakota v. United States Dep't of Interior, supra, 423 F.3d at 799, and we have found no "clear error of judgment." Minnesota Milk Producers Ass'n v. Glickman, 153 F.3d 632, 643 (8th Cir. 1998), cert. denied sub nom., Texas Ass'n of Dairymen v. Minnesota Milk Producer's Ass'n, 526 U.S. 1130 (1999), quoting Citizens to Preserve Overton Park v. Volpe, supra at 416. Accordingly, finding that the IBIA's decision is based upon substantial evidence in the Record as a whole, and finding no other fatal error, we recommend that the Respondents' Motion for Summary Judgment be granted.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Respondents' Motion for Summary Judgment [Docket No. 18] be granted.

Dated:  July 14, 2009                    *s/Raymond L. Erickson*
                                          Raymond L. Erickson
                                          CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than  July 31, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **July 31, 2009**, unless all interested parties

stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the

transcript in order to resolve all of the objections made.